UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAGERLOGIC LIMITED,<br><br>                             Plaintiff,<br><br>       vs.<br><br>PARAMOUNT DIGITAL ENTERTAINMENT, a division of PARAMOUNT PICTURES CORPORATION,<br><br>                    Defendant and<br>                  Counter-Plaintiff,<br><br>       vs.<br><br>CRYPTOLOGIC LIMITED and GAMING PORTALS LIMITED,<br><br>               Third-Party Defendants. | Civil Action No. 11 CV 4310(BSJ)(DCF)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF WAGERLOGIC'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## PRELIMINARY STATEMENT

On June 24, 2011, plaintiff WagerLogic Limited ("WagerLogic) commenced this action by filing a complaint against Paramount Digital Entertainment, a division of Paramount Pictures Corporation ("Paramount'). Exh. 1.[1] In that complaint, WagerLogic sought a declaration that a Licensing Agreement, Exh. 4, entered into between the parties as of December 15, 2008 (the "Agreement"), which Paramount claimed it had terminated, was still in effect. Specifically, WagerLogic sought a declaration that a payment due from it to Paramount by December 1, 2010 under the Agreement, and actually paid on February 24, 2011, had been made within the contractually agreed cure period, and that WagerLogic's failure to release certain merchandise that was the subject of the Agreement by a specified "Marketing Date" was

---

[1] "Exh." refers to the exhibit as attached to the declaration of Jeffrey E. Glen, one of the attorneys for plaintiff, served and filed herewith.

1

a breach of an obligation for which the contractual remedy did not include termination of the Agreement.

Paramount served and filed an answer, Exh. 2, October 18, 2011.[2]  The answer also contains counterclaims against WagerLogic seeking monetary damages for alleged breach of the Agreement, a declaration that the Agreement was validly terminated, and monetary damages for copyright infringement.  The counterclaims are the subject of WagerLogic's Reply, Exh. 3, being served and filed herewith.   The counterclaims are also denominated a "Third-Party Complaint" against CryptoLogic Limited, the ultimate parent company of WagerLogic and a guarantor under the Agreement, and Gaming Portals Limited, which is also a subsidiary of CryptoLogic Limited.

WagerLogic now moves for partial summary judgment on the causes of action in its complaint, leaving for subsequent litigation Paramount's claims – all of which WagerLogic denies -- that WagerLogic breached obligations under the Agreement for which Paramount claims monetary damages.

## STATEMENT OF RELEVANT FACTS

WagerLogic is a member of the CryptoLogic group of companies.  The group develops and in some cases provides for public use branded and non-branded casino and slot-machine style Internet gambling games.  Some of the branded games use intellectual property licensed from media companies such as Paramount. Complaint ¶1, Exh. 1..

---

[2] Defendants numbered their "Answer" as paragraphs 1 – 49, and the immediately following "Counterclaims against WagerLogic Limited and Third-party Complaint against CryptoLogic Limited and Gaming Portals Limited" as paragraphs 1 – 107.  This duplication of numbering has required plaintiff to use as citing references "Answer" with paragraph number when referring to the Answer portion of Exh. 2, and "Counterclaims" with paragraph number when referring to the Counterclaims portion of Exh. 2.

In 2008, WagerLogic and Paramount entered into the Agreement, pursuant to which Paramount granted WagerLogic the exclusive license to use intellectual property associated with twenty "Existing" and six "Future" Paramount motion pictures to develop Licensed Games, which are interactive Casual Gambling style online casino games, Agreement ¶3.2.1, Exh. 4, based on those pictures. The list of "Existing" pictures is found at Exhibit A of the Agreement; the list of "Future" pictures is set out at ¶2.1.2 of the Agreement.

In exchange for this license, WagerLogic agreed to pay to Paramount $2,000,000 in five tranches as an "Existing Pictures License Fee." Agreement ¶7.1.1. The final tranche, of $250,000, was due and payable by December 1, 2010. It was not paid by that date. The Agreement also calls for WagerLogic to pay Paramount a "Future Pictures Guarantee" of $250,000 by December 1, 2010. That payment was also not made. Thus, as of December 1, 2010, WagerLogic owed Paramount $500,000.

The Agreement also required WagerLogic to market and offer for sale "at least ... one (1) Licensed Game ... themed to a minimum of five (5) Existing Pictures" by the initial "Marketing Date", which is December 15, 2010. Agreement ¶10.3.[3] There are other "Marketing Dates" to occur in the future, involving Future Pictures, and Existing Pictures which are not amongst those selected as part of the initial distribution. Agreement Article 6.

As of December 15, 2010, three Licensed Games, themed to Braveheart, Forrest Gump, and Ferris Bueller's Day Off (each an "Existing Picture"), had been

---

[3] The December 15, 2010 date, called the "Marketing Date" in the Agreement, is calculated by counting two years from the "Effective Date" of the Agreement, which was December 15, 2008

3

released.  A number of games were in development, themed to Existing Pictures, but had not yet been released.

On February 23, 2011, Paramount sent Cryptologic Limited a letter, Exh. 5, purporting to be a "Notice of Termination" of the Agreement.[4]  The letter states that the failures to pay the final installment of the License Fee, and the Future Pictures Guaranty, on December 1, 2010, constituted material breaches of the Agreement.  The letter goes on: "Despite notice from Paramount, Cryptologic has failed to cure these material breaches."  However, the Agreement, ¶15.1, provides for a cure period of 30 days after notice of termination and full payment was made on February 25, 2011, just two days after such notice and well within the 30 day period.

The letter also states that "Cryptologic also has materially breached the Agreement by failing to satisfy the minimum release requirements for the Licensed Games set forth in Section 10.3."  Here, as well, the Agreement specifies the remedies available to Paramount, which do **not** include termination.

The February 23 letter sets the "Termination Deadline" for March 11, 2011.

## ARGUMENT

### POINT I
### THE STANDARD FOR GRANTING
### SUMMARY JUDGMENT HEREIN

Summary judgment may be granted where it is shown that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  Partial summary judgment is now specifically

---

[4] The Licensee named in the Agreement, WagerLogic, was sent a "courtesy copy" of this letter.

4

contemplated in the caption to Rule 56(a), see annotation to 2010 Amendments, Effective December 1, 2010, Subdivision (a), second paragraph.

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Atlantic Mut. Ins. Co. v. CSX Lines,* 432 F.3d 428, 433 (2d Cir. 2005). Where, as here, the only issue is the proper application of language in a contract, the court may grant summary judgment where the contractual language is "plain and unambiguous." *Zurich Am. Ins. Co. v. ABM Industries, Inc.*, 397 F.3d 158, 164 (2d Cir. 2005). If the language is unambiguous, its construction is a matter of law, to be decided by the Court, and the parties' intent is to be determined from the text of the contract itself. *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990).

Since, as demonstrated in the remainder of this Memorandum, the relevant provisions of the Agreement unambiguously establish that Paramount has no power to terminate the Agreement for the alleged breaches, there are no facts, disputable or not, that affect plaintiff's right to partial summary judgment.

### POINT II
### PARAMOUNT HAS NO RIGHT TO TERMINATE THE
### AGREEMENT FOR ALLEGED BREACH OF PARAGRAPH 7.1

The Agreement provides that if WagerLogic "fails to perform any of its obligations under this Agreement,... Paramount may terminate this Agreement on thirty (30) days prior written notice, provided [WagerLogic] shall not have remedied such failure within such (30) day period." Agreement ¶15.1.

The language is clear and unambiguous. Paramount had the power to terminate the contract. But the Agreement specifies precisely how Paramount may

5

exercise this power.  It must give WagerLogic 30 days "prior written notice" that it "terminate[s] this Agreement."  If it gives such notice, then WagerLogic must cure within "**such** (30) day period."  The Agreement  does not say that WagerLogic's thirty days to cure a failure to perform an obligation is measured from the date of the alleged failure: rather it says expressly that WagerLogic has 30 days to cure such a failure after it is given the requisite "prior written notice" that Paramount is exercising its power to "terminate this Agreement" for such failure.  The only way this language can be read is that the notice of termination is conditional, and becomes effective only if the failure to meet an obligation is not cured within 30 days.

Paramount does not even purport to have given a notice of termination of the Agreement until February 23, 2011, and it concedes that it received the late payments in full on February 25, 2011.  This being so, Paramount is left with relying on an email it sent on January 12, 2011,  as the purported notice to WagerLogic of its failure to pay the license fees due on December 1, 2010.  Counterclaim ¶39.

The reference is to an email, Exh. 6, from Luke Letizia, a Paramount Vice President, to Steve Quintin, who was representing WagerLogic in its dealings with Paramount that reads in relevant part:

> Also, there was a payment due from Cryptologic back on December 1st of $250K – I know the invoice was sent, but may have gone to Lydia Liu, who I've been informed is no longer an employee.  If you could refer me to a new person in Accounts Payable to sort this out, I'd appreciate that as well.

While Paramount characterized this email as "actual written notice", see email from Mark Lieblein, a Paramount Senior Vice President, to David Gavagan CryptoLogic's CEO, on March 11, 2011, Exh. 10, the critical question is, "actual written notice" of

6

what?  The language of Mr. Letizia's email answers the question; it is notice that the payment has not been received, and conveys at most a request that the payment be made.[5]  Certainly it is not notice of termination of the Agreement.

None of the other emails from Paramount to WagerLogic between January 12 and the actual "Notice of Termination" of February 23 even purport to terminate the Agreement.  Quite the contrary; in an email on February 3, 2011, Exh. 7, Mr. Letizia tells Mr. Quintin that Paramount is concerned because the December payment was missed, and suggests a modification to the Agreement that will "find an alternative solution to termination, give Cryptologic some relief, and hopefully allow you to generate more revenue for your company over the length of the Term."[6]  Mr. Letizia's "alternative" is for Cryptologic to market a total of 7 games, and substantially extend the royalty payment periods, while the other intellectual property licensed to WagerLogic under the Agreement, including the Future Pictures, would revert to Paramount.  That this is not a notice of termination in any sense is made evident by the proviso, in the email, that the proposed alteration is contingent on the payment not of the entire $500,000 due on December 1, but only the $250,000 tranche for Existing Pictures.  Paramount offers WagerLogic a choice; agree to an alternative program involving fewer pictures but providing substantial immediate and downstream cash savings, or have Paramount exercise its power of termination.

---

[5] As shown below, this email and its progeny were not "Notices" as defined in paragraph of the Agreement, at all.  "Notices" under the Agreement must be sent by registered or certified mail or by prepaid telegram or nationally recognized express carrier.  Agreement, ¶24.

[6] The terms of the "alternative solution", although surely relevant since they establish that Paramount had not terminated the Agreement but was using the threat of termination as a bargaining tactic, may be deemed confidential by defendants, and therefore are not set forth here.  See Exh. 7 as redacted.

7

By February 15, 2011, WagerLogic had not responded to the proposal to alter the Agreement. On that date, Mr. Letizia emailed Mr. Quintin again, telling him that "we can give you 24 more hours before sending out the termination letter, which we'll do if we don't have a response from Cryptologic by the end of business tomorrow. Not to worry, even if you're unable to get a response by then and we send out the letter, it can still be remedied." Exh. 8. This is the first mention in any communication of a possible termination, and by its terms it is conditional and contradicts any notion that a contractual cure period had been commenced.[7]   A week later, with WagerLogic still not having either responded to the proposed alternative or having made the $500,000 payment required under the Agreement, Paramount sent its "Notice of Termination." Exh. 5. Two days later, WagerLogic paid the $500,000, a full 27 days before the end of the cure period. Counterclaims ¶52.

The case law is definitive; where there is a right to cure, there must be compliance with the requisite notice provision to start the cure period running. *Filmline (Cross County) Productions, Inc. v United Artists Corp.* 662 F.Supp.2d 798 (S.D.N.Y. 1987), *aff'd.*865 F.2d. 513 (2nd Cir. 1989), controls.

The contract in *Filmline* provided that if Filmline breached an obligation, "*and shall fail to cure, correct or remedy such breach or default within thirty (30) days after service of written notice specifying same,… [UA] may:*   terminate this Agreement in its entirely." 662 F.Supp.2d at 801, emphasis in original. Filmland, which was making a film for United Artists, failed to get screenplay approval before a particular date. "It follows that at this time UA could have terminated the contract provided that

---

[7] Even were the use of the word "termination" to be viewed as an oblique attempt to trigger contractual remedies, payment was made nine days after the February 15 email.

8

UA first gave Filmland written notice that it was in breach and thirty days to cure that beach, and provided Filmland did not in fact cure that breach." *Id*, at 802.

No written notice of breach was given, and at the end of the filming UA sent notice that Filmland was in breach and that UA was terminating the agreement. The termination was held to be ineffective, precisely because "UA did not allow Filmline thirty days to cure that alleged breach before termination." *Id., at 804.* See also *New Image Construction, Inc. v. TDR Enterprises Inc.*, 74 A.D.3d 680, 681 (1st Dept. 2010)("Defendants do not claim to have served plaintiff with a 14-day notice to cure and written notice of termination which were contractual prerequisites to termination. Defendants' purported termination of the contract was, therefore, ineffective.")

The bargained for notice in *Filmland* was notice that there had been a breach and there was 30 days to cure. The bargained for notice in the present case is notice that Paramount was terminating the Agreement, and there was 30 days to cure. The failure to give the bargained for notice is identical, and the result in *Filmland* should determine the result here.

Paramount has suggested, in the Lieblein email discussed earlier, that under New York law actual notice of breach, without any mention of cure or of termination, although not strictly conforming to the notice provisions of the contract in question would suffice to allow the termination of such contract. This doctrine, if it exists at all outside the employment at will context, is limited to instances where there is no cure period, and in addition where the breaching party suffers no prejudice from the variance.

9

Thus, for example, in *Rockland Exposition, Inc., v. Alliance of Automotive Service Providers*, 706 F.Supp.2d 350 (S.D.N.Y. 2009), a contract provided for automatic renewals of one year unless notice of non-renewal was given within a 45 day window. The contract required a notice of non-renewal to be served by registered mail, and that was not done. Since the right to terminate the contract for future performance was unconditional, failure to provide the notice of termination by registered mail, as required by the agreement, would not nullify the termination "unless the party being notified did not receive the notice, or was otherwise prejudiced thereby, **since the terminated party had no cure right.**" *Id.*, at 360, emphasis added. Of course, the right to cure is explicit in the Agreement in issue here, and the failure to make explicit that unless payment was received within 30 days the Agreement would terminate defines prejudice.

*Rockland* distinguished *Filmland* on precisely this ground. In refusing to strictly enforce the contractual termination provision, the *Rockland* court wrote, "most importantly, the contract in *Filmland* made the thirty-day repair period an explicit prerequisite to its termination, whereas nothing in the Contract here suggests that breach of the non-compete provision would trigger involuntary renewal of the Contract." *Id.*, at 359.

It is incontestable that the January 12, 2011 email, which Paramount contends gave WagerLogic "notice" of an alleged failure under the Agreement does not comply with the provision of ¶24 regarding service of "Notices". That alone should determine the issue.

10

But it is also true that the purported "notice" does not even hint that it is intended to trigger the termination remedy, and thus the time within which to cure. Where the very continuation of the contractual arrangement is at stake, "'written notice requirements are fully enforceable.' Notice provisions, such as the one here, 'serve the valuable function of allowing the purportedly breaching party to distinguish between minor complaints or posturing by its contract partner and an actual threat of termination.'" *USI Insurance Services LLC v. Miner*, 2011 WL 2848139 at *2(S.D.N.Y. July 7, 2011). The internal quotes are from *Art of War Music Pulb'g v. Andrews*, 2000 WL 245908 at *2 (S.D.N.Y. Mar. 3, 2000).

In the instant case, the so-called January "notice", far from constituting notice of termination and start of the cure period, was at most a request for payment, and is better read as suggesting that WagerLogic check its invoices to see if one had actually been received. The follow-up emails in early February even suggest that the failure to receive the $500,000 due in December might prove an opportunity to revise the Agreement under which the parties were operating to cut the amount then owing in half, and stretch out future royalty payments, in exchange for WagerLogic giving up most of its rights to create additional games.

When the purported notice is not in the form required by the contract, and in particular when it does not specify that the non-performance is deemed a breach, and does not recite the cure provisions, it cannot trigger termination. *USI Insurance*, 2011 WL 2848139 at *4, *Point Prods. A.D. v. Sony Music Entm't*, 2000 WL 1006236 at *3 (S.D.N.Y. July 20, 2000). When it is the "procedure to be followed before plaintiffs could

11

be terminated" that is "breached", the cure period is not triggered. *Rebh v. Lake George Ventures, Inc.*, 223 A.D.2d 986(3rd Dept.  1996).

The first and only "notice of termination" in this case was served February 23, 2011.  It was that notice, and not an email inquiring about receipt of an invoice, that started WagerLogic's 30 day cure period running.  The failure to make the December 1 payment was cured on February 25, 2011.  WagerLogic is entitled to a declaration that Paramount has no right to terminate the Agreement for alleged breach of Paragraph 7.1.

**POINT III**
**PARAMOUNT HAS NO RIGHT TO TERMINATE THE**
**AGREEMENT FOR ALLEGED BREACH OF PARAGRAPH 10.3.**

The Agreement enables WagerLogic to develop "Licensed Games" themed to two sets of motion pictures owned or controlled by Paramount.  The first set of motion pictures, denominated the "Existing Pictures", Agreement ¶2.1.1, was made available to WagerLogic as of December 15, 2008.  The second set of motion picture, denominated the "Future Pictures", Agreement ¶2.1.2, are to be made available to WagerLogic in May and June of 2012, Agreement ¶6.2.  As noted in the Statement of Relevant Facts, the initial "Marketing Date" for the first five games was to be December 15, 2010 Agreement ¶10.3.

The operative language pertaining to an alleged failure by WagerLogic to meet the "Marketing Date" for distributing a minimum of Games themed to five Existing Pictures is found in paragraph 10.3.1 of the Agreement.  That paragraph permits Paramount, on ten days written notice, to "terminate this Agreement and the rights granted to [WagerLogic] with respect to such Property(ies) that do not comply with the

12

Marketing Date ..."  Since it is common ground that games themed to three Paramount pictures had already been released, and therefore "comply with the Marketing Date", failure to distribute under ¶10.3.1 can arise only regarding two of the pictures which were not yet marketed.  Put another way, the Agreement would continue as to the games already released themed to Paramount pictures, and the word "termination" can only mean the cessation of WagerLogic's rights to two of the "Property(ies)" not released by the Marketing Date. There is no cure period applicable to missing a Marketing Date.

In sum, there is only one logical and reasonable reading of the above language.  If a Marketing Date is missed, Paramount can terminate WagerLogic's rights under the Agreement upon ten days written notice with respect to the Existing Pictures in development for which the Marketing Date had passed.  WagerLogic cannot avoid that termination through cure.   That is the sole and exclusive remedy provided by ¶10.3.1.

The language of ¶10.3.1 is materially different from the language of ¶15.1, which governs termination of the entire Agreement.    Whereas ¶15.1 provides Paramount with the right to terminate the Agreement in full for a material breach upon thirty days prior written notice if such breach is not cured within the thirty days, ¶10.3 provides for a different, and much more limited, remedy of termination, on ten days written notice, only of WagerLogic's rights in those Existing and Future Pictures for which WagerLogic did not met the applicable Marketing Date.

Different language establishes different remedies.  A ¶10.3 breach means that a particular Licensed Game themed to a particular picture goes on the market late.

13

Forfeiture of the right to theme a Game to that picture, without the opportunity to cure, is a harsh penalty, but it is the penalty to which WagerLogic agreed. To read a ¶10.3 delay as triggering termination of the entire Agreement, without the opportunity to cure, is to read ¶15.1 totally out of the contract. It would work a forfeiture not just of WagerLogic's right to seek to market a particular Game over the period of the Agreement, but would forfeit WagerLogic's rights in all of the Existing and Future Pictures, force WagerLogic to withdraw the three games that it already has distributed by the Marketing Date, and lose any opportunity to make back through distribution and sales the $2,000,000 in the Existing Pictures License Fee that it had paid by the end of February, 2011. Penalties of that severity are only permitted under the Agreement when they can be cured.

There is ample case law dealing with this situation, where there are differing provisions in a contract addressing differing situations. The analytic framework is simple: "A contract should be construed so as to give full meaning and effect to all of its provisions." *Patsy's Italian Restaurant, Inc. v. Banas,* ___ F.3d ___, 2011 WL 3687887 (2nd Cir. Aug. 24, 2011), quoting from *American Express Bank Ltd. v. Uniroyal, Inc.,* 164 A.D.2d 275, 277 (1st Dept. 1990). This doctrine, as applied to contracts in which a particular right or obligation arguably is covered by more than one provision, instructs the court to select an interpretation that if possible gives "full effect" to both provisions. Guidance is provided by *NYMAGIC v. LaFarge North America Inc.,* 599 F.3d 102, 122 (2nd Cir. 2010). In *LaFarge,* a maritime insurance contract covered a barge that broke away mooring in Hurricane Katrina and allegedly caused the breach of a levee. The contract in one provision required the insured to act promptly to protect

14

the policy holder's interest, which it did by retaining counsel, and in another provision gave the insurance company the right to limit the policy holder's choice of counsel to defend property damage claims. The Second Circuit held that both provisions had to be honored if possible, and devised a solution; the insurance company was required to pay the full legal costs incurred by the policy holder until the insurance company gave the insured an appropriate selection of law firms from which to choose. See also *Wyeth v. King Pharmaceuticals, Inc.*, 96 F.Supp.2d 280, 287 (E.D.N.Y. 2005)(where a contract "created different remedies" for breach of two different obligations, the differentiation had to be applied lest the court render a provision "superfluous".)

A corollary doctrine instructs the court not to interpret a contract "so as to render any of its clauses meaningless." *UBS Securities LLC v. Red Zone LLC*, 77 A.D.3d 575, 579 (1st Dept. 2010). Thus, in the cited case, a compensation provision to ousted management was triggered by a "change of control", which was contractually defined to mean a significant combination between the target company and the takeover company, acquisition by the acquirer of more than 50% of the capital stock of the target, or "acquisition by [the takeover company] of control of [the target} through a proxy contest or otherwise." A proxy contest by the takeover company was successful, and it obtained a majority on the board of the target, replacing the CEO and senior management, although no combination of businesses occurred and the takeover company did not acquire a majority of the target's stock. The ousted CEO sued for his severance package, and succeeded – as he should – because to deprive him of his contractual right on the claim that "control" was ambiguous and a jury issue would make the "acquisition" language meaningless.

15

This common sense view determines the 10.3.1 issue.  If as Paramount contends a marketing date violation lets Paramount terminate the entire Agreement, then the supposed lesser remedy becomes meaningless since it is subsumed in the extreme relief.

Rejecting this argument, Paramount reads 10.3.1 to give it a choice of remedies.  That would be correct if the paragraph read that Paramount could " terminate this Agreement **or** the rights granted to [WagerLogic] with respect to such Property(ies) that do not comply with the Marketing Date …"  But it doesn't read that way.  It reads, could " terminate this Agreement **and** the rights granted to [WagerLogic] with respect to such Property(ies) that do not comply with the Marketing Date …"   In other words, Paramount reads ¶10.3 to supply two different remedies where only one remedy is set forth in the Agreement.

A nearly identical situation  was considered by the New York Court of Appeals in *Two Guys from Harrison – N.Y., Inc. v. S.F.R. Realty Associates*, 63 N.Y.2d 396, 403, n.3 (1984).  In *Two Guys*, a tenant was permitted under its lease to "make any **interior** non-structural alterations, additions and improvements in, or and to Parcel No. 1 of the demised premises which it may deem necessary or desirable … (emphasis added)"  The tenant proposed to make "**exterior** additions and improvements", arguing that the permission clause should be read disjunctively.  According to the tenant, it could make "non-structural alterations" to the interior, **or** "additions and improvements" to the exterior.  As the court defined the tenant's argument, "'interior non-structural alterations, additions and improvements' refers to two different activities – 'interior non-structural alterations' and 'additions and improvements."  This attempt to create two

16

distinct rights from a single unified sentence was held to be "unsound and [it] can be summarily dismissed."

Had the parties intended that a failure to meet a Marketing Date would trigger termination of the entire Agreement, they easily could have so specified with particularity, and placed the provision in the termination article.  Such a drastic remedy can be agreed by contracting parties, but it requires a high degree of specificity.  Compare, for example, the contract language in *Cornerstone Realty Group, LLC v. County of Greene*, 18 Misc.3d 1146(A), *4 (Sup. Ct. Greene Co.), aff'd. 28 A.D.3d 1033 (3rd Dept. 2006), which provided that "This agreement shall terminate automatically and immediately upon … Cornerstone's failure to build twenty (20) homes to completion in Sleepy Hollow by December 2003."  The builder missed the deadline, and the Court held, "Pursuant to the express and unequivocal terms of the contract, the contract terminated automatically upon failure of the condition." *Id.*

The present Agreement is the antithesis of that in *Cornerstone*.  In order to trigger **any** remedy, Paramount must notify WagerLogic that it intends to seek redress for missing a Marketing Date; nothing "automatically" occurs.  As Paramount's own pleading demonstrates, see its litany of supposed efforts "to work with WagerLogic to resolve the breach,", Paramount Counterclaims and Third-party Complaint at ¶41, as late as two months after the missed Marketing Date Paramount was offering to let WagerLogic complete those games then currently under development.  Whether this behavior waived Paramount's right to retrieve even two Existing Pictures will be developed as this litigation progresses; surely it confirms WagerLogic's contention that

17

the only remedy reserved for a missed Marketing Date is forfeiture of the very games whose Marketing Date was missed.

Further, in its own terms ¶10.3 cannot terminate WagerLogic's license agreement in the Future Pictures, for which no Marketing Date has yet occurred. WagerLogic's license rights in the Future Pictures do not commence until 2012, and WagerLogic's Marketing Date for Future Picture does not expire until 2014.  Under the plain terms of ¶10.3 of the Agreement, Paramount can terminate license rights granted to WagerLogic only with respect to "such Property (ies) that do not comply with the Marketing Date."  As WagerLogic's license rights in the Future Pictures have not yet vested, the Marketing Date for distributing a Licensed Game themed from any such Future Picture is still more than three years away, and WagerLogic timely cured its payment breach, Paramount cannot terminate WagerLogic's rights in the Future Pictures.

## CONCLUSION

WagerLogic, after paying $1,750,000 to Paramount without yet recouping a nickel in sales, was late in making a scheduled payment.  Six weeks later Paramount inquired whether its invoice for that payment had been misplaced, nothing more.  Based on that slender reed, Paramount seeks to forfeit licenses worth multiple millions to the CryptoLogic companies, even though when the notice of termination for failure to meet an obligation was furnished a few weeks thereafter, WagerLogic immediately cured its default, as it had a right to do.  Such a forfeiture ought not, and under the law cannot, occur without the strictest compliance with the contracted procedures.

18

WagerLogic, after developing and delivering games themed to three pictures, missed the marketing date for the next two.  Such a glitch had been foreseen by the parties, and a particularly appropriate remedy had been crafted.  If a game was late in delivery, Paramount could take back, forthwith, its property in that game, and immediately relicense it to a CryptoLogic competitor.  Nothing more.

And this all makes perfect sense.  For fundamental breaches, the penalty is termination of the entire Agreement, but such termination can only take place once WagerLogic knows that's what is in the cards, and gets a second chance.  For a breach involving a delay in a game or two, the penalty is giving up that game, a far lesser punishment, but one that mere lateness, without a cure period, makes irremediable.

The Agreement is clear and unambiguous that these remedies are to coexist; the law recognizes that such is the only appropriate reading.  For the reasons set forth herein, WagerLogic is entitled to a declaration that its payment after notice of termination of the December 2010 installments cured its default, and that Paramount had no right to terminate the Agreement because two games were not delivered by the Marketing Date as set forth in the Agreement.


Dated:   New York, New York
         November 22, 2011

                                    ANDERSON KILL & OLICK, P.C.

                              By:   _____
                                    Lawrence Kill (LK-2685)
                                    Jeffrey E. Glen (JG-8277)
                                    1251 Avenue of the Americas
                                    New York, NY  10020
                                    Tel:  212-278-1722

                                    Attorneys for Plaintiff WagerLogic Limited

19